706 S.E.2d 63

Christian and Elizabeth HARPER, on their own Behalf and on Behalf of those Similarly Situated, Plaintiffs,

v.

JACKSON HEWITT, INC., Defendant.

No. 35295.

Supreme Court of Appeals of West Virginia.

Submitted April 13, 2010.

Decided Nov. 23, 2010.

John W. Barrett, Esq., Brian A. Glasser, Esq., Jonathan R. Marshall, Esq., Bailey & Glasser, Charleston, WV, for Plaintiffs.

Charles L. Woody, Esq., Spilman, Thomas & Battle, Charleston, WV, for Defendant.

Lonnie Simmons, Esq., DiTrapano, Barrett & DiPiero, Charleston, WV, for Amici Curiae, AARP, et al.

BENJAMIN, Justice:

This matter is before the Court upon a September 29, 2009, order of the United States District Court for the Southern District of West Virginia, Huntington Division, which certified the four following questions:

1. "Does a tax preparer who receives compensation, either directly from the borrower or in the form of payments from the lending bank, for helping a borrower obtain a refund anticipation loan meet the statutory definition of a credit services organization, or a "CSO," (W. Va.Code § 46A–6C–2(a)), and do the borrowers in such a transaction meet the definition of a buyer (*id.* § 46A–6C–1(1))?

2. Is the appropriate limitations period for actions alleging violations of the CSO statutes (*id.* § 46A–6C–1 *et seq.*) and the statutory prohibition on unfair or deceptive acts or practices (*id.* § 46A–6–104) four years under West Virginia Code § 46A–5–101(1), or one year under the general limitation period in West Virginia Code § 55–2–12?

3. Are the contractual agency disclaimers in the refund anticipation loan applications enforceable under West Virginia law?

4. Is a tax preparer who helps a customer obtain a refund anticipation loan in exchange for compensation an agent under West Virginia law?

By order dated November 12, 2009, this Court accepted the certified questions and docketed the matter for resolution. Upon review of the parties' briefs, arguments and the record, we answer the certified questions, as reformulated, and remand this matter for further proceedings consistent with this opinion.[1]

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

This putative class action was originally filed by Linda Hunter in the United States

1. We wish to acknowledge the contribution of the following amici curiae who filed a joint brief in support of the plaintiffs in this matter: AARP, the Center for Responsible Lending, Consumer Action, Consumer Federation of America, Consumer's Union, Public Citizen, the National Consumer Law Center, U.S. PIRG, West Virginia Alliance for Sustainable Families and West Virginia Senior Legal Aid.

District Court for the Southern District of West Virginia, Huntington Division, against Jackson Hewitt, Inc.[2] Mrs. Hunter hired Jackson Hewitt to prepare her federal income tax return for the 2005 tax year, and in the process, purchased a Refund Anticipation Loan ["RAL"], which allows customers to obtain a loan based upon their anticipated income tax refund. Mrs. Hunter claimed that she allowed Jackson Hewitt to forward her application for the RAL, along with her tax return, to Santa Barbara Bank and Trust ["SBB & T"], a lending institution.[3] She claimed that the RAL carried an exorbitant interest rate and was financially unsound, and that Jackson Hewitt received secret payments back from SBB & T and concealed profits from SBB & T for arranging the loan.

In her complaint, Mrs. Hunter alleged that Jackson Hewitt: (1) breached its fiduciary duty to her arising out of an agency relationship; (2) breached its fiduciary duty arising out of a confidential relationship; (3) breached its fiduciary duty arising out of Jackson Hewitt's status as a loan broker; (4) breached West Virginia statutes governing credit organizations; (5) breached its contract with her; and (6) committed unfair or deceptive acts or practices in violation of West Virginia law. On November 6, 2007, the District Court granted Jackson Hewitt's motion to dismiss the claims alleging breach of fiduciary duty arising out of a confidential relationship and breach of a fiduciary duty arising out of its status as a loan broker, but denied Jackson Hewitt's request to dismiss the remaining counts.[4] On March 13, 2008, the District Court granted Jackson Hewitt's motion for partial summary judgment on Plaintiff's breach of contract claim, finding that no contract with Mrs. Hunter existed, as there was simply nothing in the provisions cited by the Plaintiff which a reasonable juror could find contractually obligated Defendant to Plaintiff with respect to the RAL.

Also on March 13, 2008, the parties filed a joint motion to amend the scheduling order, stating that "Defendant has obtained discovery relating to Plaintiff and her husband's tax returns. Mrs. Hunter no longer desires to participate in this action, and Plaintiff's counsel have determined that Mrs. Hunter is not an appropriate class representative." On April 21, 2008, Plaintiff moved for leave to amend the complaint to substitute Christian and Elizabeth Harper[5] and Donna Wright

2. Jackson Hewitt is engaged in the principal business of tax preparation.

3. Jackson Hewitt represented in its brief that over the last several years, it has entered into agreements with SBB & T, a federally regulated bank and a division of Pacific Capital Bank, N.A. Under these agreements, SBB & T is permitted to offer a variety of financial products to customers at Jackson–Hewitt's company-owned and independently owned and operated franchise offices. SBB & T offered two basic financial products to customers:
(1) SBB & T could provide a one-time bank account to receive the customers' refund in as little as 8 to 15 days in exchange for a flat fee (which was known as an Accelerated Check Refund in 2005 and 2006 and an Assisted Refund in 2007 and 2008); or
(2) SBB & T could offer a loan to customers that would be paid back from the customers' refund, which is known as a refund anticipation loan.
If a customer selected a financial product from SBB & T, the customer had to pay additional fees to SBB & T. In exchange for permitting SBB & T to offer its financial products to Jackson Hewitt customers, Jackson Hewitt receives fees from SBB & T. Prior to 2006, Jackson Hewitt was compensated by SBB & T on a per-financial product basis. For 2006, 2007, and 2008, Jackson Hewitt received fees from SBB & T pursuant to two agreements: a Program Agreement and a Technology Services Agreement. In these years, Jackson Hewitt received a lump sum from SBB & T at the beginning of each year.

4. In its order, the District Court reasoned that although "Plaintiff placed her confidence with Defendant with regard to her taxes, and Defendant accepted that confidence, those facts only extend to whether there was a confidential relationship with regard to Plaintiff's taxes." There were no similar allegations regarding Plaintiff's RAL. Additionally, the District Court found that Jackson–Hewitt was not a loan broker because "[t]here is nothing to suggest that Defendant took part in any direct negotiations of the terms of the contract between Plaintiff and the bank, nor is there anything to indicate that Defendant has authority the power to negotiate the terms of the contract when it was offered to Plaintiff." The District Court further reasoned that "the fact that Defendant accepted compensation from SBB & T does not make Defendant a broker."

5. Jackson Hewitt represented in its brief that since 2002, the Harpers had their tax returns prepared by Walter Hudnall, Jr., a West Virginia citizen. When the Harpers first utilized Mr. Hudnall's services, he operated his own business

for Mrs. Hunter. The District Court granted this motion on June 30, 2008. However, in its order, the District Court stated that "those claims in the Amended Complaint which previously were dismissed and/or for which Defendant was granted summary judgment are not revived by virtue of the Amended Complaint being filed." The Amended Complaint was filed that same day.[6]

In February 2009, Plaintiffs moved for class certification and partial summary judgment with respect to their credit services organization ["CSO"] claim. On February 13, 2009, Jackson Hewitt filed its cross motion for summary judgment on the three remaining claims. These motions were fully briefed before the District Court.

On April 7, 2009, almost two and a half years after the case was brought in the District Court, Plaintiffs moved to certify the above four questions to this Court. On September 29, 2009, the District Court granted Plaintiffs' motion to certify four questions to this Court, denied in part Defendant's motion for summary judgment, denied without prejudice the remainder of Defendant's motion for summary judgment, denied without prejudice Plaintiffs' motion for summary judgment, and held in abeyance Plaintiffs' motion for class certification. In its order, the District Court found the following: 1) it denied Jackson Hewitt's motion for summary judgment regarding whether there is sufficient evidence of an injury to maintain a CSO claim, finding that an injury exists if the CSO statute is violated, regardless of whether a consumer may be willing to take the same course of action if he could go back in time; 2) the District Court acknowledged that plaintiffs' CSO claims may be moot if they are preempted by the National Bank Act, 12 U.S.C. § 24, but denied without prejudice defendant's motion for summary judgment on this issue to wait to address the subject of preemption after this Court determines whether the CSO statute applies to Jackson Hewitt and following the Fourth Circuit's impending decision in *H & R Block Eastern Enterprises, Inc. v. Turnbaugh*, Nos. 08–2162, and 08–2163 (4th Cir. Filed Oct. 9, 2008)[7]; 3) denied Jackson Hewitt's motion for summary judgment on whether there was sufficient evidence of an agency relationship, breach of fiduciary duty and damages, finding that there is a sufficient basis to allow a jury to determine whether Jackson Hewitt breached its alleged duty of loyalty and trust to plaintiffs and whether plaintiffs suffered damages, but asking this Court to determine whether an agency relationship exists in the first instance; and 4) denied Jackson Hewitt's motion for summary judgment on plaintiff's unfair or deceptive act or practice claim, finding that if this Court determined that

---

as a franchise of a tax service named DanTax. Subsequently, Mr. Hudnall signed a franchise agreement with Jackson Hewitt, Inc. and continued to run his own business in the same location. Mr. Hudnall is not a party to this lawsuit. The record reveals that the Harpers applied for and obtained RALs on January 11, 2005, January 14, 2006, January 29, 2007, and February 1, 2008. The Harpers' annual interest rates were 57.618%, 56.983%, 83.108%, and 56.42% respectively. In 2005, the Harpers paid $126 in tax preparation and documentation fees to Mr. Hudnall and another $125 in fees and finance charges to SBB & T. In 2006, the Harpers paid $133 in tax preparation and processing fees to Mr. Hudnall and $120 in fees and finance charges to SBB & T. In 2007, the Harpers paid $113 in tax preparation fees to Mr. Hudnall and $124.95 in fees and finance charges to SBB & T. In 2008, the Harpers paid $133 in tax preparation fees to Mr. Hudnall and $125.95 in fees and finance charges to SBB & T. For these years, the Harpers obtained loans of $5,273, $5,627, $3,888, and $5,678 from SBB & T respectively.

6. Subsequently, on September 4, 2008, the parties stipulated to dismissal without prejudice of Donna Wright's claims.

7. Following the District Court's order, this case has since been decided by the Fourth Circuit Court of Appeals. In *H & R Block Eastern Enterprises, Inc. v. Raskin*, 591 F.3d 718 (4th Cir.2010) (the case style was changed to reflect to replacement of Commissioner Charles Turnbaugh by Commissioner Sarah Bloom Raskin), the Fourth Circuit Court of Appeals vacated and remanded an order of the District Court of Maryland, holding that a determination had to first be made by the District Court as to whether a tax-services provider was a "credit services business" under Maryland's Credit Services Business Act (CSBA) before a determination could be made by the Fourth Circuit Court of Appeals as to whether the National Bank Act (NBA), in conjunction with regulations promulgated thereunder, conflict-preempted the CSBA as it applied to the provider.

Jackson Hewitt qualifies as a CSO, then pursuant to W. Va.Code § 46A–6C–7(d), a "breach by a credit services organization under this article, or any obligation arising from this article, is an unfair or deceptive act or practice." Accordingly, the only presently remaining claims are for breach of a fiduciary duty related to an agency relationship, violation of the statutes governing CSO's, and a claim for unfair or deceptive acts or practices. On November 12, 2009, this Court agreed to review the certified questions. The District Court stayed the entire case until the certified questions presented are answered by this Court.

## II.

## STANDARD OF REVIEW

Pursuant to W. Va.Code § 51–1A–3 (2005), "the supreme court of appeals of West Virginia may answer a question of law certified to it by any court of the United States or by the highest appellate court or the intermediate appellate court of another state or of a tribe of Canada, a Canadian province or territory, Mexico or a Mexican state, if the answer may be determinative of an issue in a pending cause in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state." W. Va.Code § 51–1A–3.

 We have consistently recognized that " '[a] *de novo* standard is applied by this court in addressing the legal issues presented by a certified questions from a federal district or appellate court.' Syl. Pt. 1, *Light v. Allstate Ins. Co.*, 203 W.Va. 27, 506 S.E.2d 64 (1998)." Syl. Pt. 2, *Aikens v. Debow*, 208 W.Va. 486, 541 S.E.2d 576 (2000); *See also* Syl. Pt. 1, *Feliciano v. 7–Eleven, Inc.*, 210 W.Va. 740, 559 S.E.2d 713 (2001); Syl. Pt. 1, *T. Weston Inc. v. Mineral County*, 219 W.Va. 564, 638 S.E.2d 167 (2006). Under this plenary standard of review, we now proceed to consider the arguments of the parties.

## III.

## DISCUSSION

### A) *Application of the Credit Services Organization Act*

 The first of four certified questions presented for review is as follows:

1. "Does a tax preparer who receives compensation, either directly from the borrower or in the form of payments from the lending bank, for helping a borrower obtain a refund anticipation loan meet the statutory definition of a credit services organization, or a "CSO," (W. Va.Code § 46A–6C–2(a)), and do the borrowers in such a transaction meet the definition of a buyer (*id.* § 46A–6C–1(1))?

 In this particular case, we have determined that the most efficient way to resolve this question is to separate this question into two different inquiries. This Court has the authority to reformulate certified questions if necessary. *See, e.g., Charleston Area Med. Ctr., Inc. v. Parke–Davis*, 217 W.Va. 15, 24 n. 12, 614 S.E.2d 15, 24 n. 12 (2005). Reformulating the certified questions may be particularly appropriate where "a certified question is framed so that this Court is not able to fully address the law which is involved in the question." *Barefield v. DPIC Cos.*, 215 W.Va. 544, 550, 600 S.E.2d 256, 262 (2004)(*quoting* Syl. Pt. 3, *Kincaid v. Mangum*, 189 W.Va. 404, 432 S.E.2d 74 (1993)). Accordingly, the reformulated certified questions to be answered are as follows:

1.a.) Does a tax preparer who receives compensation either directly from the borrower or in the form of payments from the lending bank, for helping a borrower obtain a refund anticipation loan meet the statutory definition of a credit services organization under W. Va.Code § 46A–6C–2(a)?

1.b.) Do the borrowers in a refund anticipation loan transaction meet the definition of a buyer under W. Va.Code § 46A–6C–1(1))?

Pursuant to W. Va.Code § 46A–6C–1 *et seq.* (2004), a CSO is defined as:

a person who, with respect to the extension of credit by others and in return for the payment of money or other valuable consideration, provides, or represents that the person can or will provide, any of the following services:

(1) Improving a buyer's credit record, history or rating;

(2) Obtaining an extension of credit for a buyer; or

(3) Providing advice or assistance to a buyer with regard to subdivision (1) or (2) of this subsection.

W. Va.Code § 46A–6C–2(a).[8]

A "buyer" under W. Va.Code § 46A–6C–1(1) (1991) is defined as follows:

(1) "Buyer" means an individual who is solicited to purchase or who purchases the services of a credit services organization as defined in section two of this article.

W. Va.Code § 46A–6C–1(1).

Herein, plaintiffs assert that pursuant to the straightforward controlling definition in W. Va.Code § 46A–6C–2(a), Jackson Hewitt is a CSO because it "assists RAL buyers in obtaining extensions of credit in return for the payment of money." Plaintiffs contend that, as a facilitator, Jackson Hewitt handles all aspects of the RAL transaction for borrowers, from negotiating terms with the lending banks, to marketing availability of the product, to completing and submitting loan applications to the banks, to distributing the loan proceeds to the purchasers. Plaintiffs further point out that the RAL purchasers actually have no personal contact whatsoever with the lending banks because Jackson Hewitt handles everything. Moreover, plaintiffs contend that Jackson Hewitt facilitates RALs "in return for the payment of money or other valuable consideration." Plaintiffs state that before 2006, Jackson Hewitt received directly from the lending bank a documentation fee for each RAL transaction that it facilitated, plus it received a sizeable share of other RAL fees. Plaintiffs also argue that after 2006, Jackson Hewitt changed its compensation scheme to receive lump sum payments from SBB & T for facilitating the RALs. Despite the lump-sum payment arrangement, plaintiffs assert that Jackson Hewitt is still being paid for facilitating the RALs, and it was therefore assisting plaintiffs obtain an extension of credit in return for the payment of money.

Furthermore, plaintiffs argue that they also qualify as "buyers" under the statutory definition of that term, as they purchased, or were solicited to purchase, the services of a CSO under W. Va.Code § 46A–6C–1(1). Before 2006, plaintiffs paid Jackson Hewitt a "documentation fee" or "application fee" for their RALs. Plaintiffs assert that this was a direct payment to Jackson Hewitt for its credit services. After 2006, plaintiffs paid Jackson Hewitt indirectly, through fees allegedly paid back from SBB & T to Jackson Hewitt. Plaintiffs contend that the statute makes no distinction between direct and indirect compensation. Rather, all that is required is that a buyer be solicited to purchase or purchase the services of a CSO. Plaintiffs also point out that the Legislature's recent exemption of car dealers under W.

**8.** Under § 46A–6C–2(b), the following are exempt from this article:

(1) A person authorized to make loans or extensions of credit under the law of this state or the United States who is subject to regulation and supervision by this state or the United States, or a lender approved by the United States secretary of housing and urban development for participation in a mortgage insurance program under the National Housing Act (12 U.S.C. Section 1701 *et seq.*);

(2) A bank or savings and loan association whose deposit or accounts are eligible for insurance by the federal deposit insurance corporation or the federal savings and loan insurance corporation or a subsidiary of such a bank or savings and loan association;

(3) A credit union doing business in this state;

(4) A nonprofit organization exempt from taxation under Section 501(c)(3) of the Internal Revenue Code of 1986;

(5) A person licensed as a real estate broker or salesman under the Real Estate Brokers License Act acting within the course and scope of that license;

(6) A person licensed to practice law in this state acting within the course and scope of the person's practice as an attorney;

(7) A broker-dealer registered with the securities and exchange commission or the commodity future trading commission acting within the course and scope of that regulation;

(8) A consumer reporting agency;

(9) A person whose primary business is making loans secured by liens on real property;

(10) A person whose primary business is the retail sale of automobiles and trucks: *Provided,* That the person is not extending credit for a buyer, excluding assignments; and

(11) A person licensed to practice public accounting in this state acting within the course and scope of the person's practice as an accountant.

Va.Code § 46A–6C–2(b), who are paid indirectly by lenders for facilitating loans, just like Jackson Hewitt, makes it clear that the CSO statute applies regardless of whether the loan-facilitator is paid directly or indirectly for its services.

Conversely, Jackson Hewitt asserts that under the plain terms of the CSO statute, it is not a "credit services organization" and the Harpers are not "buyers" under the Act. Jackson Hewitt contends that the CSO statute requires that there be an express or implicit agreement between the "buyer" and the "credit services organization" in which the CSO will obtain credit or assist the buyer in obtaining credit from a third party in exchange for compensation. It contends that because the Legislature enacted the phrase "in return" in W. Va.Code § 46A–6C–2(a), this contemplates a bilateral agreement in which one party provides one thing of value in return for another thing of value from the other party. It contends that Jackson Hewitt's agreement is not with the plaintiffs, but rather, the agreement is between Jackson Hewitt and SBB & T.

Additionally, Jackson Hewitt contends that the statutory language restricts the CSO's application only to situations where a company agrees to act "for the buyer," and the statute is not intended to apply where the company agrees to perform services for a bank. Jackson Hewitt points out that the CSO requires that the company promise to provide "an extension of credit *for a buyer*" under W. Va.Code § 46A–6C–2(a)(2), or provide "advice or assistance *to a buyer*" under W. Va.Code § 46A–6C–2(a)(3)(emphasis added). Thus, it contends that the Legislature must have intended for the CSO to apply when there is an agreement in which a CSO has agreed to perform services to or for the benefit of a buyer. Jackson Hewitt asserts that the District Court has already found that it did not have an agreement with the Harpers to obtain a RAL for them.

Moreover, Jackson Hewitt asserts that plaintiffs cannot be "buyers" under the Credit Services Organization Act ("CSOA") because the record establishes that the Har-

pers never paid, nor were they solicited to pay, Jackson Hewitt in connection with their RAL. It contends that in 2005 and 2006, the Harpers paid fees to SBB & T and to Walter Hudnall, Jr., neither of which are a party to this lawsuit, for the RALs they received.[9] In 2007 and 2008, the Harpers paid fees only to SBB & T and therefore can only be deemed to be a purchaser of services or a "buyer" from SBB & T, not Jackson Hewitt. It contends that because the Legislature limited the scope of the CSO statute to "buyers," direct payment is required.

Additionally, Jackson Hewitt contends that the context of the CSO statute demonstrates the Legislature's purpose in enacting the statute was to protect consumers with poor credit from unscrupulous businesses-so called credit repair companies—promising that they will assist the consumer with obtaining credit or improving their credit rating for a fee. For example, W. Va.Code § 46A–6C–3 prohibits a CSO from guaranteeing that it could obtain credit for customers regardless of the customer's credit history or from guaranteeing that it could erase the customer's bad credit history. *See* W. Va.Code § 46A–6C–3 (1991). There are also a series of registration and bonding requirements along with a series of stringent penalties, all of which are designed to prevent companies and individuals from making promises to consumers with poor credit and then simply absconding with the money. *See* W. Va.Code § 46A–6C–4 (1991) (bonding requirements); W. Va.Code § 46A–6C–5 (2001) (registration requirements); W. Va.Code § 46A–6C–9 (1991) (allowing disgorgement and punitive damages); and W. Va.Code § 46A–6C–10 (1991) (providing for criminal penalties for anyone who violates the CSO statute.) Jackson Hewitt contends that none of these provisions make any sense outside of the context of credit repair companies, let alone where the lender, not the consumer, has a services agreement with the retailer.

Lastly, Jackson Hewitt contends that if the CSO were found to apply to it, not only would numerous parts of the statute be federally preempted, but such an interpretation

---

**9.** Jackson Hewitt asserts that plaintiffs cannot attribute the decisions of Mr. Hudnall, as an independently owned and operated franchise, to it.

would also lead to absurd results. It contends that such a ruling would subject hundreds of retailers across West Virginia to substantial forfeitures and would prohibit any retailer from contracting with a bank in connection with allowing customers to apply for credit, as retailers routinely utilize their own brand name to promote credit cards offered by third-party banks and then invite customers to apply for the bank's credit card through the retailer's websites or in their stores.

 Pursuant to the express language of the CSOA, W. Va.Code § 46A–6C–1 *et seq.* whether fees were paid directly or indirectly to Jackson Hewitt has no bearing on this Court's answer to either of the first two reformulated certified questions. First, when we read the plain and unambiguous terms of § 46A–6C–2(a), we find that the first reformulated certified question is easily answered. West Virginia Code § 46A–6C–2(a) does not contain a requirement that a consumer pay the CSO directly. W. Va.Code § 46A–6C–2(a) broadly defines a CSO as the following:

> a person who, with respect to the extension of credit by others and *in return for the payment of money or other valuable consideration,* provides, or represents that the person can or will provide, any of the following services:

> (1) Improving a buyer's credit record, history or rating;

> (2) *Obtaining an extension of credit for a buyer; or*

> (3) *Providing* advice or *assistance to a buyer with regard to subdivision* (1) or *(2) of this subsection.*

W. Va.Code § 46A–6C–2(a) (emphasis added).

Whether the Legislature intended to require direct payment or not, the plain and broad sweeping language contained the statute leads us to no other possible conclusion.[10] Accordingly, we find that a tax preparer who receives compensation, either directly from the borrower or in the form of payments from the lending bank, for helping a borrower obtain a RAL meets the statutory definition of a credit services organization under W. Va.Code § 46A–6C–2(a). In this case, the limited set of facts presented reveals that Jackson Hewitt, at the very least, assisted the plaintiffs in obtaining an extension of credit from SBB & T, the lending bank, and Jackson Hewitt was paid for this service.[11] Thus, Jackson Hewitt qualifies as a CSO in this instance.

Likewise, with respect to the second reformulated certified question, question "1.b.", we find that the borrowers in a RAL transaction meet the definition of a "buyer" under

---

**10.** We observe the express intended application of the federal counterpart to our CSO statute, the federal Credit Repair Organizations Act ("CROA"), § 15 U.S.C. 1679 *et seq.* to apply only to "credit repair organizations." Pursuant to § 15 U.S.C. 1679a(3)(A) (1996), a "credit repair organization" is defined to mean:

> (A) ... any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of—(i) improving any consumer's credit record, credit history, or credit rating; or (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i); ...."

§ 15 U.S.C. 1679a(3)(A). However, in examining the West Virginia CSO statute, W. Va.Code § 46A–6C–1 *et seq.* we note the breadth of the statutory language used by our Legislature in defining a "credit services organization." Unlike the federal CROA, our CSOA does not expressly

limit the definition of a credit services organization to those "improving any consumer's credit record, credit history, or credit rating." Without some clear indication from the Legislature demonstrating its intent to expressly exclude tax preparers offering RALs from coverage by the CSOA, we are bound to apply the plain and unambiguous terms of the statute.

**11.** Indeed, the District Court's Memorandum Opinion and Order certifying the above stated questions to this Court contains only a very limited set of facts. While the District Court failed to make actual findings of fact in its order, a limited statement of facts has been provided to this Court such that we are able to make a determination as to whether the CSOA applies to Jackson Hewitt, whether the plaintiffs are buyers under the CSOA, and the applicable statute of limitations in CSOA actions. To the extent that further facts are required to answer the questions presented to this Court regarding agency, we must remand the matter to the District Court for such determinations to be made, as discussed *infra.*

W. Va.Code § 46A–6C–1(1). As stated above, a "buyer" under W. Va.Code § 46A–6C–1(1) is "an individual who is solicited to purchase or who purchases the services of a credit services organization as defined in section two of this article." W. Va.Code § 46A–6C–1(1). Unquestionably, the limited record before us reveals that Jackson Hewitt solicited the plaintiffs to purchase RALs in this case. Jackson Hewitt advertises the availability of RALs and the tax preparers in its stores to complete and submit RAL applications to the lending bank for the consumer. Additionally, based upon the broad language utilized by the Legislature in W. Va.Code § 46A–6C–2(a), we find that the plaintiffs likewise qualify as "buyers" under W. Va. Code § 46A–6C–1(1) because they purchased, whether indirectly or directly, the services of a credit services organization.

 In arriving at this conclusion, we are persuaded by the fact that if the Legislature intended that only those who receive direct consumer payments be covered by the CSOA, it could have expressly so-provided. Likewise, given this broad sweeping language, if the Legislature intended that tax preparers be exempted from the CSOA, it could have expressly included tax preparers in the list of exemptions found in W. Va.Code § 46A–6C–2(b). However, the Legislature chose to do neither of these things. This Court has long held that, in deciding the meaning of a statutory provision, "[w]e look first to the statute's language. If the text, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed." *Appalachian Power Co. v. State Tax Dep't*, 195 W.Va. 573, 587, 466 S.E.2d 424, 438 (1995). Indeed, our principles of statutory interpretation hold that the terms of a clear statute must be read "according to its unvarnished meaning." *Arnold v. United Companies Lending Corp.*, 204 W.Va. 229, 238, 511 S.E.2d 854, 863 (1998). "If the language of an enactment is clear and within the constitutional authority of the law-making body which passed it, courts must read the relevant law according to its unvarnished mean-

ing, without any judicial embroidery." Syl. Pt. 4, *West Virginia Health Care Cost Review Authority v. Boone Memorial Hosp.*, 196 W.Va. 326, 472 S.E.2d 411 (1996). *See also DeVane v. Kennedy*, 205 W.Va. 519, 529, 519 S.E.2d 622, 632 (1999)("When the language of a statutory provision is plain, its terms should be applied as written and not construed.").

 Furthermore, the CSOA, W. Va.Code § 46A–6C–1 *et seq.* is encompassed as a part of the West Virginia Consumer Credit and Protection Act ("CCPA"), W. Va.Code § 46A–1–101 *et seq.* This Court has recognized that the CCPA is a remedial statute intended to protect consumers from unfair, illegal and deceptive business practices, and must be liberally construed to accomplish that purpose. *State ex rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.*, 194 W.Va. 770, 777, 461 S.E.2d 516, 523 (1995); *Dunlap v. Friedman's, Inc.*, 213 W.Va. 394, 399, 582 S.E.2d 841, 846 (2003). It is a comprehensive attempt on the part of the West Virginia Legislature to extend protection to consumers and persons who obtain credit in state. *In re Machnic*, 271 B.R. 789, 791 (2002). Applying these principles to the undisputed facts outlined above, we are bound to find that the CSO statute applies to Jackson Hewitt in the RAL transactions at issue herein, and that the plaintiffs qualify as buyers under the aforementioned statute.[12]

### 2) *Applicable Statute of Limitations*

 In light of our answers to the first, two-parted, reformulated certified questions, we next address the certified question presented to this Court regarding the applicable statute of limitations. The certified question presented is as follows:

Is the appropriate limitations period for actions alleging violations of the CSO statutes (*id.* § 46A–6C–1 *et seq.*) and the statutory prohibition on unfair or deceptive acts or practices (*id.* § 46A–6–104) four years under West Virginia Code § 46A–5–101(1),

---

**12.** This opinion is limited to answering questions certified to this Court specifically related to Jackson Hewitt, not other West Virginia retailers.

We encourage the Legislature to amend the provisions of W. Va.Code § 46A–6C–1 *et seq.* to provide a clarification of the CSOA.

or one year under the general limitation period in West Virginia Code § 55–2–12?

Herein, plaintiffs contend that because a violation of the CSO statute is an unfair or deceptive act or practice ("UDAP") [13], the four year statute of limitations applicable to UDAPs governs an action for a violation of the CSO statute under W. Va.Code § 46A–5–101(1) (1996). The UDAP statute of limitation contained in W. Va.Code § 46A–5–101(1) provides, in part:

> With respect to violations of this Chapter arising from consumer credit sales or consumer loans made pursuant to revolving charge accounts or revolving loan accounts, or from sales as defined in article 6 [46A–6–101 et seq.] of this chapter, no action pursuant to this subsection may be brought more than four years after the violations occurred.

Plaintiffs assert that the RAL transaction and resultant violation of Chapter 46A's provisions arises from a "sale" as that term is defined in Chapter 46A. "Sale means any sale, offer for sale or attempt to sell … any services or offer for services for cash or credit." W. Va.Code § 46A–6–102(5) (2005). Plaintiffs contend that by obtaining RALs for its West Virginia customers, Jackson Hewitt is offering those customers the sale of their services in obtaining RALs. They believe this conclusion is reinforced by the statutory definition of "sale of services." "Sale of services means furnishing or agreeing to furnish services and includes making arrangements to have services furnished by another." W. Va. Code § 46A–1–102(43) (1996). They argue that in the RAL transaction, Jackson Hewitt "furnishes or agrees to furnish [its] services" of facilitating the RAL transaction. Likewise, because Jackson Hewitt serves as an intermediary and facilitator of a loan between the RAL purchaser and the lending bank, plaintiffs contend that Jackson Hewitt "mak[es] arrangements to have services furnished by another." Thus, plaintiffs asserts that these provisions demonstrate that the applicable statute of limitations is four years.

Conversely, Jackson Hewitt asserts that the appropriate statute of limitations for actions alleging violations of the CSOA is one year pursuant to W. Va.Code § 55–2–12(c) (1959), which provides the following:

> Every personal action for which no limitation is otherwise prescribed shall be brought: (a) Within two years next after the right to bring the same shall have accrued, if it be for damage to property; (b) within two years next after the right to bring the same shall have accrued if it be for damages for personal injuries; and (c) within one year next after the right to bring the same shall have accrued if it be for any other matter of such nature that, in case a party die, it could not have been brought at common law by or against his personal representative.

W. Va.Code § 55–2–12(c).

Jackson Hewitt maintains that W. Va.Code § 46A–5–101(1) applies only to actions brought against a "creditor", as evidenced by the first sentence of the statute. It contends that W. Va.Code § 46A–5–101(1), in its entirety, provides the following:

> If a creditor has violated a provision of this chapter applying to collection of excess charges, security in sales and leases, disclosure with respect to consumer leases, receipts, statements of account and evidences of payment, limitations on default charges, assignment of earnings, authorization to confess judgment, illegal, fraudulent or unconscionable conduct, any prohibited debt collection practice, or restrictions or interest in land as security, assignment

---

**13.** Plaintiffs have filed a UDAP claim because the CSO statute expressly provides that a violation of Article 6C constitutes an unfair or deceptive act or practice. W. Va.Code § 46A–6C–7(d) (1991) provides the following:

> The breach by a credit services organization of a contract under this article, or of any obligation arising from this article, is an unfair or deceptive act or practice.

W. Va.Code § 46A–6C–7(d). The UDAP provision of the CCPA provides that "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are … declared unlawful." W. Va.Code § 46A–6–104 (1974). This Court has observed that this provision is "among the most broadly drawn provisions contained in the Consumer Credit and Protection Act[.]" *McFoy v. Amerigas, Inc.,* 170 W.Va. 526, 529, 295 S.E.2d 16, 19 (1982).

of earnings to regulated consumer lender, security agreement on household goods for benefit of regulated consumer lender, and renegotiation by regulated consumer lender of loan discharged in bankruptcy, the consumer has a cause of action to recover actual damages and in addition a right in an action to recover from the person violating this chapter a penalty in an amount determined by the court not less than one hundred dollars nor more than one thousand dollars. With respect to violations arising from consumer credit sales or consumer loans made pursuant to revolving charge accounts or revolving loan accounts, or from sales as defined in article six of this chapter, no action pursuant to this subsection may be brought more than four years after the violations occurred. With respect to violations arising from other consumer credit sales or consumer loans, no action pursuant to this subsection may be brought more than one year after the due date of the last scheduled payment of the agreement.

W. Va.Code § 46A–5–101(1).

Jackson Hewitt asserts that pursuant to the plain language of the statute, the four year statute of limitations only applies to "actions pursuant to this subsection"—meaning only actions against "creditors," and not for every conceivable claim under the West Virginia CCPA. Because Jackson Hewitt is not a creditor, Jackson Hewitt contends that the four year statute of limitations does not apply.

In analyzing the plain language of W. Va. Code § 46A–5–101(1), in its entirety, we cannot agree with Jackson Hewitt that the statute is only intended to apply to "creditors." As Jackson Hewitt correctly points out, the first sentence of the statute does in fact purport to place a penalty directly upon "creditors" who have violated certain provisions of chapter 46A. However, the second sentence of the statute, which is not limited specifically to creditors, more broadly provides the following:

> With respect to *violations of this Chapter arising from* consumer credit sales or consumer loans made pursuant to revolving charge accounts or revolving loan accounts,

or from *sales as defined in article 6 [46A–6–101 et seq.] of this chapter,* no action pursuant to this subsection may be brought more than four years after the violations occurred.

W. Va.Code § 46A–5–101(1)(emphasis added).

When we analyze the above quoted language in the context of the circumstances involved in RAL transactions, we agree with the contentions of the plaintiffs that the RAL transaction and resultant violation of Chapter 46A's provisions arises from a "sale" as that term is defined in Chapter 46A. "Sale means any sale, offer for sale or attempt to sell ... any services or offer for services for cash or credit." W. Va.Code § 46A–6–102(5). By obtaining RALs for its West Virginia customers, Jackson Hewitt is offering those customers the sale of their services in obtaining RALs. This conclusion is indeed reinforced by the statutory definition of "sale of services." "Sale of services means furnishing or agreeing to furnish services and includes making arrangements to have services furnished by another." W. Va.Code § 46A–1–102(43). In the RAL transaction, Jackson Hewitt "furnishes or agrees to furnish [its] services" of facilitating the RAL transaction. Likewise, because Jackson Hewitt serves as an intermediary and facilitator of a loan between the RAL purchaser and the lending bank, we find that Jackson Hewitt "mak[es] arrangements to have services furnished by another." Accordingly, under the express terms of these statutory provisions, we find that for actions alleging violations of the CSOA, W. Va.Code § 46A–6C–1 *et seq.* and the resulting statutory prohibition on unfair or deceptive acts or practices specifically identified in W. Va.Code § 46A–6–104, the applicable statute of limitations is four years pursuant to W. Va.Code § 46A–5–101(1).

### C) Claims Regarding Agency

The last two issues confronting this Court pertain to plaintiffs' agency related claims in this case. As previously stated, certified questions three and four are as follows:

3. Are the contractual agency disclaimers in the refund anticipation loan applica-

tions enforceable under West Virginia law?

4. Is a tax preparer who helps a customer obtain a refund anticipation loan in exchange for compensation an agent under West Virginia law?

This Court has previously held that "[a]n agent in the restricted and proper sense is a representative of his principal in business or contractual relations with third persons; while a servant or employee is one engaged, not in creating contractual obligations, but in rendering service, chiefly with reference to things but sometimes with reference to persons when no contractual obligation is to result.' Syl. Pt. 3, *State ex rel. Key v. Bond*, 94 W.Va. 255, 118 S.E. 276 (1923)." Syl. Pt. 2, *Teter v. Old Colony Co.*, 190 W.Va. 711, 441 S.E.2d 728 (1994). *Accord,* Syl. Pt. 3, *Thomson v. McGinnis*, 195 W.Va. 465, 465 S.E.2d 922 (1995). " 'One of the essential elements of an agency relationship is the existence of some degree of control by the principal over the conduct and activities of the agent.' Syl. Pt. 3, *Teter v. Old Colony*, 190 W.Va. 711, 441 S.E.2d 728 (1994)." Syl. Pt. 2, *Thomson v. McGinnis*, 195 W.Va. 465, 465 S.E.2d 922. In *State ex rel. Clark v. Blue Cross Blue Shield of West Virginia, Inc.*, 203 W.Va. 690, 714, 510 S.E.2d 764, 788 (1998), we offered the following additional authorities on the subject of agency:

3 Am.Jur.2d *Agency* § 1, at 509–10 (1986) ("The term 'agency' means a fiduciary relationship by which a party confides to another the management of some business to be transacted in the former's name or on his account, and by which such other assumes to do the business and render an account of it. It has also been defined as the fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act. Thus, the term 'agency,' in its legal sense, always imports commercial or contractual dealings between two parties by and through the medium of another. In an agency relationship, ... the one who acts for and represents the principal, and acquires his au-

thority from him, is known and referred to as an 'agent.' " (footnotes omitted)); 2A C.J.S. *Agency* § 4, at 552, 554–55 (1972) (stating that "[a]gency is succinctly defined as a relation created by an agreement between the parties; relationship between a principal and his agent; the representation of one called the principal by another called the agent in dealing with third persons; the relation resulting where one person authorizes another to act for him in business dealings with others," and defining agent as "one who acts for or in the place of another by authority from him; a person having express or implied authority to represent or act on behalf of another person who is called his principal; a person employed or authorized by another to act for him, or to transact business for him ...." (footnotes omitted)); 1A Michie's Jurisprudence *Agency* § 2, at 666 (1993) ("An agent is one who represents another, called the principal, in dealings with third persons. He is one who undertakes some business or to manage some affair for another by authority of or on account of the latter and to render an account of it." (footnotes omitted)).

*Id.* at 714, 510 S.E.2d at 788.

In *Arnold v. United Companies Lending Corp.*, 204 W.Va. 229, 511 S.E.2d 854, a case involving a lawsuit filed by borrowers against a lender and loan broker seeking declaratory judgment that an arbitration agreement that was signed as part of a loan transaction was void and unenforceable, this Court was similarly asked to determine by way of certified question whether a loan broker acts as an agent of prospective borrowers. Therein, we concluded that "[l]ike the duty of disclosure, the answer to this question is fact dependent; one must examine the facts of a particular case to determine whether an agency relationship exists." *Id.* at 240, 511 S.E.2d at 865. In answering the certified question, we stated that

" '[p]roof of an express contract of agency is not essential to the establishment of the relation. It may be inferred from facts and circumstances, including conduct.' " *General Elec. Credit Corp. v. Fields*, 148 W.Va. 176, 181, 133 S.E.2d 780, 783 (1963).

In Syllabus Point 2 of *Thomson v. McGinnis,* 195 W.Va. 465, 465 S.E.2d 922 (1995), this Court stated:

> "One of the essential elements of an agency relationship is the existence of some degree of control by the principal over the conduct and activities of the agent." Syl. Pt. 3, *Teter v. Old Colony Co.,* 190 W.Va. 711, 441 S.E.2d 728 (1994).

*See Peters v. Riley,* 73 W.Va. 785, 791, 81 S.E. 530, 532 (1914) (no agency found where "[a]ll the essential elements of the contract remained in the sole and exclusive control of the defendant"); *see also Wright & Souza, Inc. v. DM Properties,* 1 Neb. App. 822, 510 N.W.2d 413 (1993) (prospective borrower failed to establish that loan broker acted as borrower's agent where borrower had no control over broker). This Court further stated in *Thomson* that a principal denying agency must show that the principal neither controlled, nor had the right to control, the work, and *"where factual conflict exists regarding the degree of control exercised and the nature of the relationship thereby created, jury resolution is warranted."* 195 W.Va. at 470, 465 S.E.2d at 927. Thus, in answer to the last part of certified question three, we emphasize that the existence of an agency relationship between a loan broker and prospective borrowers is fact dependent, and *absent proof that the borrowers had the right to, or did, exert some degree of control over the conduct of the broker, no agency can be found to exist.*

*Id.* at 239–240, 511 S.E.2d at 864–865 (emphasis added).

██ Guided by our longstanding principles of agency law, we find that, as it pertains to certified question four,[14] because the question of whether an agency relationship exists is generally fact dependent, the question of whether a tax preparer who helps a customer obtain a refund anticipation loan in exchange for compensation is an agent under West Virginia law is fact dependent, and absent proof that the consumer had the right to, or did, exert some degree of control over the conduct of the tax preparer, no agency can be found to exist. To the extent that the District Court's Memorandum Opinion and Order certifying the subject questions to this Court fails to contain sufficient undisputed findings of fact regarding the specific conduct of the parties which would allow this Court to determine whether an agency relationship existed in this particular case, we remand this issue back to the District Court for resolution in accordance with our existing principles of agency law and the guidance provided in this opinion.[15]

██ Likewise, as it pertains to certified question three regarding whether the contractual agency disclaimers in the refund anticipation loan applications are enforceable under West Virginia law, we find that to the extent that West Virginia law governing the existence of an agency relationship recognizes that the underlying conduct of the parties can be reviewed to determine whether an agency relationship exists,[16] whether a rela-

14. To the extent that our answer to certified question three is dependent upon our resolution of certified question four, we address certified question four first.

15. As evidenced by the parties' briefs, the facts as they pertain to this issue are rather detailed and disputed. This issue will need to be resolved by analyzing the specific nature of the relationship created between the parties in each particular year that the plaintiffs received refund anticipation loans. Such an analysis requires the District Court's review of multiple depositions and testimony regarding each of the parties' conduct, and other evidence of this nature with which this Court was not provided.

16. *See, e.g. State ex rel. Clark v. Blue Cross Blue Shield of West Virginia, Inc.,* 203 W.Va. 690, 714, 510 S.E.2d 764, 788 (*quoting* 2A C.J.S. Agency 4,

at 552, for the proposition that "[a]gency is succinctly defined as a relation created by an agreement between the parties"). *See also Cole v. Fairchild,* 198 W.Va. 736, 746, 482 S.E.2d 913, 923 (1996)("[A]gency means a fiduciary relation[ship] which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to this control, and consent by the other so to act."); *John W. Lohr Funeral Home, Inc. v. Hess & Eisenhardt Co.,* 152 W.Va. 723, 728–31, 166 S.E.2d 141, 146–49 (1969)(reviewing the conduct of the parties in determining whether an agency relationship existed even where the contract between the parties expressly disclaimed any agency relationship.); *State ex rel. Yahn Elec. Co. v. Baer,* 148 W.Va. 527, 532, 135 S.E.2d 687, 690 (1964)("While agency is usually created by express contract between the parties, it may be

tionship is characterized as agency in an agreement between parties is not necessarily controlling. *See* Restatement (Third) of Agency 1.02 (*citing, inter alia, MJ & Partners Rest. Ltd. P'ship v. Zadikoff,* 10 F.Supp.2d 922, 932 (N.D.Ill.1998)("the existence of an agency relationship is determined on the actual practices of the parties, and not merely by reference to a written agreement."), and *Prudential Ins. Co. v. Eslick,* 586 F.Supp. 763, 764 (S.D.Ohio 1984)(action by insurer against former salesman alleging breach of fiduciary duty; although contract between insurance company and former salesman characterized salesman as an "independent contractor," nature of parties' relationship must be determined by comprehensive factual analysis; court denied insurer's motion for summary judgment on point that former salesman was its agent)). Because the nature of the parties' relationship must be determined by a comprehensive factual analysis in order to determine whether Jackson Hewitt's agency disclaimer is enforceable, and this Court does not have before it sufficient undisputed findings of fact allowing this Court to conduct such analysis, we remand this issue back to the District Court for resolution in accordance with our existing principles of agency law and the guidance provided in this opinion.

## IV.

## CONCLUSION

In summary, we answer the first reformulated certified question to find that a tax

preparer who receives compensation, either directly from the borrower or in the form of payments from the lending bank, for helping a borrower obtain a refund anticipation loan meets the statutory definition of a credit services organization under W. Va.Code § 46A–6C–2(a) (2004). We therefore answer the second reformulated certified question to find that the borrowers in a refund anticipation loan transaction meet the definition of a buyer under W. Va.Code § 46A–6C–1(1) (1991). With respect to the certified question presented regarding the applicable statute of limitations, we find that for actions alleging violations of the Credit Services Organizations Act, W. Va.Code § 46A–6C–1 *et seq.* and the resulting statutory prohibition on unfair or deceptive acts or practices specifically identified in W. Va.Code § 46A–6–104, the applicable statute of limitations is four years pursuant to W. Va.Code § 46A–5–101(1). Lastly, because certified questions three and four regarding the issue of agency are fact dependent in nature, we return these issues to the District Court for resolution in accordance with our existing principles of agency law and the guidance provided in this opinion.

**Certified Questions Answered.**

---

implied from the conduct of the parties and the nature and the circumstances of the particular acts done."); Restatement (Third) of Agency § 1.01 (2008)(before an agency relationship is established, there is a requirement that "the agent manifests assent or otherwise consents so

to act."); Restatement (Third) of Agency § 1.03 ("A person manifests assent or intention through written or spoken words or other conduct.").