WALKER, Chief Justice:
*830 In this case we consider the validity of $ 4.7 million in mechanic's liens filed under West Virginia Codes § 38-2-31 and -32 (2011) by Petitioner Hanover Resources, LLC (Hanover), a provider of coal mining services, against the fee interest of a mineral estate partially owned by Respondent LML Properties, LLC (LML).[1] Considering the framework in the mechanic's lien statutes and relevant case law along with undisputed facts in the form of stipulations by the parties regarding their contractual responsibilities, we agree with the circuit court that the mechanic's liens at issue are invalid and affirm the circuit court's order granting summary judgement to LML.
I. FACTS AND PROCEDURAL BACKGROUND
To evaluate the liens at issue, we first examine the parties' thirty-five year contractual relationship. LML is the partial owner of real property containing coal in Boone County, West Virginia. LML routinely leases its properties to third-party coal operators in exchange for a royalty interest.
On September 28, 1984, LML entered into a Restatement of Lease and Other Documents (Amended Base Lease) with Cedar Coal Company (Cedar Coal) to mine LML's coal from various seams on its Boone County property.[2] Under Section 5.2 of the Amended Base Lease, Cedar Coal was required to pay the greater of (a) minimum royalties, regardless of whether coal was mined, at an amount specified in the Amended Base Lease[3] or (b)
*831 production royalties based upon the amount of coal mined from LML's properties.[4] LML received only minimum royalty payments because not enough mining occurred to trigger the payment of the production royalties. When read together, Section 5.2's minimum royalty provision and Section 8.2's Mine-or-Pay-Clause[5] confirm that while mining was authorized, it was not required.
After multiple assignments over approximately thirty-five years, Patriot Coal acquired Cedar Coals's interest in Tracts 7, 8, and 9 of the Amended Base Lease. Patriot Coal then assigned that interest to two of its subsidiaries, Kanawha Eagle Coal, LLC and Kanawha River Ventures, LLC (Patriot Subsidiaries). On February 11, 2010, the Patriot Subsidiaries entered into Coal Subleases with WWMV, LLC (WWMV), another coal operator, with respect to certain seams of coal on Tracts 7, 8, and 9.
The Coal Subleases provided that: (a) the Patriot Subsidiaries, as sublessors, were subleasing the "right to mine" certain seams of coal to WWMV;[6] (b) the Amended Base Lease controlled with respect to any conflict or inconsistency between it and the Coal Subleases;[7] (c) the Patriot Subsidiaries remained obligated to make direct royalty payments to LML;[8] and (d) WWMV was not to be considered an agent or employee of the Patriot Subsidiaries or LML.[9]
Although LML was not a party to the Coal Subleases, LML, the Patriot Subsidiaries, and WWMV entered into the "Agreement, Lease Amendment, and Consent to Sublease" (Consent to Sublease) on the same day the Coal Subleases were executed. The Consent to Sublease made clear that it was not to be "construed as a novation but is merely consent to the foregoing [Coal Subleases.]" In relevant part, the Consent to Sublease also provided that: (a) LML consented to the Coal Subleases between the Patriot Subsidiaries and WWMV as required by the Amended Base Lease; (b) the Patriot Subsidiaries and WWMV would indemnify LML for matters arising from WWMV's actions on the subleased property;[10] (c) the Patriot Subsidiaries' royalty recoupment rights under the Amended Base Lease would be temporarily *832 modified; (d) WWMV's rights and obligations to the subleased property were contained in the Coal Subleases; and (e) the Patriot Subsidiaries remained bound by the terms of the Amended Base Lease.
Four days later, on February 15, 2010, WWMV and Hanover entered into a Contract Mining Agreement for Hanover to provide mining services as an independent contractor for WWMV. Notably, LML was not a party to the Contract Mining Agreement and there is no evidence that LML was ever aware of its existence. The Contract Mining Agreement established an initial one-year term, followed by month-to-month renewals. Rather than establishing a contract price, it provided that WWMV and Hanover would mutually agree to labor rates. The Contract Mining Agreement also provided that: (a) Hanover would perform its work "without direction or control"; (b) Hanover would be solely responsible for paying its employees; (c) Hanover would submit weekly invoices to WWMV; and (d) after Hanover paid its employees, WWMV would then pay each weekly invoice within ten days following the receipt of each invoice. By executing the Contract Mining Agreement, Hanover acknowledged that it was provided the Amended Base Lease and Coal Subleases and consented to the terms of those agreements. Hanover further agreed that it would assume any obligations and conditions under the documents as if it were a party to them.[11]
Pursuant to the Contract Mining Agreement, Hanover provided mining services at one of the two Patriot Subsidiaries and security services at the other. While Hanover sent WWMV weekly invoices for coal mining and security services at each mine from January 26, 2014 to September 21, 2014, WWMV did not pay them. Rather than stopping work immediately and demanding payment, Hanover claims that it continued to provide WWMV with laborers until late September of 2014 when the amount of unpaid weekly invoices totaled $ 4,757,693.82.
On December 15, 2014, Hanover recorded notices of mechanic's liens in the amount of its unpaid invoices with the Clerk of the County Commission of Boone County against the fee interest of LML's mineral estate. Then, Hanover filed suit against WWMV for breach of contract due to the nonpayment of the invoiced labor costs-to which WWMV confessed judgment-and against LML for enforcement of the liens. Hanover further alleged that WWMV, as a sublessee of the property, was acting as the agent for LML in entering into its contract with Hanover. During discovery, Hanover stipulated to the following: (a) it did not enter into a contract nor have any communications with LML relative to the property or work at issue; (b) it did not have a contractual relationship or any other relationship with LML before the work in question; (c) LML did not induce or promise anything to Hanover that caused Hanover to enter into a contract with WWMV; (d) LML did not induce or promise anything to Hanover that caused Hanover to provide services on the Patriot Subsidiaries' property; (e) during the applicable time, LML did not direct or control any activities or work on the property; (f) all of Hanover's employees were paid by Hanover during the time period in question; (g) no coal mining whatsoever took place at one of the two Patriot Subsidiaries; and (h) the royalty amounts received by LML were the same as it would have received if no coal had been mined from the Patriot Subsidiaries' mine.
Following discovery, Hanover and LML filed cross-motions for summary judgment *833 regarding the validity of Hanover's mechanic's liens. On November 15, 2017, the circuit court granted LML's summary judgment motion and denied Hanover's partial summary judgment motion because it found that the mechanic's liens were invalid under West Virginia law. Additionally, the circuit court found that (a) the Coal Subleases did not change the outcome of Hanover's claims; (b) Hanover expressly agreed that WWMV was not its agent; (c) Hanover must remove its liens against LML; (d) LML was not unjustly enriched; and (e) Hanover's citation to extra-jurisdictional case law was inapposite and undercut its arguments. Hanover seeks relief from this Order.
II. STANDARD OF REVIEW
We review a circuit court's entry of summary judgment under a de novo standard of review.[12] Rule 56 of the West Virginia Rules of Civil Procedure clarifies the standard for granting a motion for summary judgment and states, in pertinent part:
[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.[13 ]
III. DISCUSSION
In considering Hanover's six assignments of error,[14] we note at the outset that a proponent of a lien claim must establish that its claims are lienable. In United States Blowpipe Co. v. Spencer ,[15] we held that:
[t]o render a mechanic's lien valid, it must appear upon its face that all provisions of the statute necessary to its creation have been substantially complied with, and where, by proper pleadings, a fact material and necessary to its validity is put in issue, the burden is upon the one asserting the lien to establish such fact by proof.[16 ]
We have previously held that because of the harshness of the available remedies for enforcement of a mechanic's lien, the mechanic's lien statutes must be strictly construed when considering whether the underlying requirements have been met.[17]
First, we consider the question of whether Hanover has a legally valid mechanic's lien against real property owned by LML under Chapter 38, Article 2 of the West Virginia Code. Hanover asserts that there is a valid mechanic's lien-and that the circuit court erred in finding otherwise-because (a) WWMV was a general contractor who had a contract with LML by virtue of the Amended Base Lease, the Coal Subleases, and the Consent to Sublease; and (b) Hanover was a subcontractor that provided labor and services to WWMV pursuant to the Contract Mining Agreement.
West Virginia Code § 38-2-2 permits a subcontractor's lien in limited circumstances:
Every person, firm or corporation who, under and by virtue of a contract with such general contractor as is mentioned in section one [§ 38-2-1] of this article, or with a subcontractor for a part of such work, either for an agreed contract price or by day or by piece, or other basis of payment , shall furnish any part of the materials, machinery or other necessary supplies or equipment, or shall perform any labor, do any work or provide any services necessary to the completion of any general contract, such as is mentioned *834 in section one [§ 38-2-1] of this article, shall have such a lien for his or her compensation, as is provided for in section one [§ 38-2-1] of this article.[18 ]
And, West Virginia Code § 38-2-1 provides:
Every person, firm or corporation who erects, builds, constructs, alters, removes or repairs any building or other structure, or other improvement appurtenant to any such building or other structure, or who alters or improves the real property whereon the same stands, or to which it may have been removed, or who provides services for any of the foregoing, under and by virtue of a contract with the owner for such erection, building, construction, alteration, removal or repair, either for an agreed lump sum or upon any other basis of settlement and payment , shall have a lien upon such building or other structure or improvement appurtenant thereto, and upon the interest of the owner thereof in the real property whereon the same stands, or to which it may have been removed, to secure the payment of such contract price or other compensation therefor.[19 ]
To fall within the purview of the contractor's lien statutes, there is a threshold determination that the relationship at issue is that of a general contractor and subcontractor and not that of a lessor and lessee. Hanover claims WWMV was LML's general contractor with respect to the mining operations at issue, making Hanover a subcontractor. Conversely, LML contends, and the circuit court agreed, that LML was the lessor and WWMV was its sublessee-not a general contractor obligated to conduct work at the Patriot Subsidiaries' mines. We agree.
In considering the proper characterization, we note that there are inherent, fundamental differences between property leases and contracts to perform work. As the circuit court recognized, this case is substantially different from the customary mechanic's lien case involving a property owner who hires a contractor to improve the property and who is not paid for doing so. This Court has defined a lease as a temporary conveyance of an owner's property in exchange for rent to a third-party who temporarily acquires legal possession.[20] Alternatively, we have defined a contract for work as an agreement to perform specific work in exchange for agreed upon compensation.
From the text of West Virginia Code §§ 38-2-1 and - 2, we derive the requirements for a finding of an owner/contractor relationship in this context: (a) there must be a contract between the owner and a contractor obligating the contractor to perform the work; and (b) there must be an agreement by the owner to pay the contractor for the work.[21] A review of the relevant agreements indicates that neither of these requirements are met.
We first turn to the Amended Base Lease, the Consent to Sublease, and the Coal Subleases, which together provide WWMV with a leasehold estate in the property at issue. Nothing in these documents obligated WWMV to perform any work or to mine any set amount of coal from the property at issue. Likewise, LML did not agree to pay or provide any compensation to WWMV. Rather, under the Coal Subleases and the Amended Base Lease, LML was to be paid a production royalty on coal mined from the leased property or a minimum monthly royalty in lieu of a production royalty depending on the amount of coal mined. And, LML was not obligated to pay any mining costs, production costs, or expenses incurred-all of those expenses were to be shouldered by WWMV. Simply put, LML was to sit back and receive royalty payments in exchange for WWMV mining the coal from LML's property. But Hanover seeks to reach farther than our law will allow to attach to LML's interest in the leased property.
We considered this scenario in *835 Lilly v. Munsey .[22] There, owners of a parcel of real estate leased the property for the purpose of constructing and operating a race track with authorization to "erect all buildings necessary to the operation of the race track, or for any other lawful purpose, on the land owned by [the lessor] and included in said leased premises."[23] The lessee hired the plaintiff to construct the racetrack. When the plaintiff was not paid for certain work, he filed a mechanic's lien against the property interest of the lessors and sought to enforce the lien. The circuit court agreed that the lien was enforceable against the lessor's property, but we reversed the ruling and held in Syllabus Point 1 that:
Under statute, a mechanic's lien for supplies and labor used in improvement of real estate to bind [the] interest of [the] owner of such real estate, or any interest therein, must be based on contract for such improvement with such owner of the real estate or interest therein, or his duly authorized agent.[24 ]
We also commented on the need for an expressly created agency relationship:
In the absence of some special provision creating a lessee as an agent for the lessor, the mere relation of lessor and lessee does not make the lessee the agent of the lessor to contract for work on leased premises, although the interest of the lessee in the land, created by the lease, may be made the subject of a mechanic's lien.[25]
Significantly, we noted, the lessee in Lilly was not required to perform any work. Rather, he was merely authorized to do so.
Although not in the coal extraction context, the legal posture of the parties in Lilly are similar to the parties in this case. Like the cost of building the race track in Lilly , under the Amended Base Lease, all expenses associated with the mining/extraction of coal from the leased property were to be borne exclusively by the lessee. And, as we will elaborate below, in this case the relevant agreements provide an authorization to act, rather than a requirement to act.
Dunlap v. Hinkle[26] followed Lilly . In Dunlap , the lease agreement between a lessor (landowner) and lessee provided that any improvements to the property would be considered the property of the landowner upon termination of the lease.[27] The lessee hired the plaintiff to perform electrical and carpentry work on a building located on the leased property but failed to pay for the work.[28] As a result, the plaintiff filed a mechanic's lien against the landowner's property.[29] We ultimately found that the lessee was not a general contractor or subcontractor when he contracted with the plaintiff to perform the labor in question.[30]
In Dunlap , we explained the evidence required for a finding of an agency relationship between the lessor and lessee:
Where the terms of a lease simply authorize a lessee to make improvements to the leased premises, although the improvements become the property of the lessor upon termination of the lease, a party with whom the lessee has contracted to make the improvements may not assert a mechanic's lien against the property interest of the lessor in the leased premises. There must be some other evidence that the lessee was acting as the agent of the lessor in making improvements to the leased premises, however, mere acquiescence or inactive consent by the lessor of the leased premises to the improvements by the lessee is not sufficient to constitute a finding of agency between the lessor and the lessee for the purpose of asserting a mechanic's lien against the property interest of the lessor.[31 ]
*836 Now applying our logic in Lilly and Dunlap to the facts of this case, we first note that Hanover made several critical stipulations that the circuit court properly considered in determining whether (a) the relationship between WWMV and Hanover is that of a lessee and sublessee or contractor and subcontractor; and (b) whether there is an agency relationship between WWMV and LML. Hanover stipulated that (a) it did not have a contract with LML; (b) LML did not induce or promise anything to Hanover that caused it to enter into the contract with WWMV; (c) LML did not induce or promise anything to Hanover that caused it to provide services on the property; and (d) LML did not direct or control activities or work on the property.
Despite these stipulations, in its second assignment of error, Hanover contends that its mechanic's liens are valid because LML and WWMV are in contractual privity by virtue of the Consent to Sublease, adopting through the Coal Subleases the Amended Base Lease, which, Hanover alleges, required WWMV to mine coal from the property. In support of its position, Hanover points to Section 8.2's heading "Obligation to Mine" and the language that requires WWMV to "energetically pursue" mining. Because of this alleged obligation to mine, Hanover asserts that WWMV is LML's contractor and agent for purposes of the West Virginia's mechanic's lien statute. We look to the text of Section 8.2 of the Amended Base Lease:
8.2 Obligation to Mine. It is understood that it is anticipated that the leased premises will be developed as a coal mining property and that [Cedar] expects to energetically pursue such development, but that such development is dependent on numerous factors, many of which are not within the control of either party. Accordingly, [Cedar] shall have the sole discretion to determine from time to time the timing of operations hereunder and this Agreement shall not be forfeited or cancelled for failure on the part of [Cedar] to commence exploration, development or mining operations on the leased premises or to diligently prosecute mining operations once such operations have been commenced, it being expressly understood that payment of minimum royalty fully compensates [LML] for any such failure.[32 ]
Upon review of Section 20.3 of the Amended Base Lease, which defines certain terms, it is clear that the title "Obligation to Mine" merely addresses the topic of the section and does not create an affirmative duty. Second, any mention of energetic pursuit of mining is displaced with the section's clear guidance that the decision on how aggressively to mine-or whether to mine altogether- is within the "sole discretion" of WWMV and that LML maintains only a royalty interest. Critically, Section 8.2 expressly states that "payment of minimum royalty fully compensates [LML] for any such failure [to mine]."
We agree with the circuit court that there was no contract between LML and Hanover and no communication or relationship whatsoever between LML and Hanover relative to the work at issue. We likewise agree that LML did not direct or control Hanover's mining activities nor did LML induce Hanover to work on the property. We agree that there was no requirement that coal be mined from the property by virtue of the Mine-or-Pay Clause found in Section 8.2 of the Amended Base Lease. There is no dispute that the Coal Subleases expressly provided that "WWMV shall in no way be considered an agent or employee of [the Patriot Subsidiaries] or [LML]." We agree with the circuit court's characterization of LML as "nothing more than remote mineral estate owners who received royalty payments regardless of whether mining activity took place or not." Applying the principles of Lilly and Dunlap to the facts of this case, we find that the mechanic's liens against LML's property are invalid because WWMV's activities were authorized by the Amended Base Lease, but not required.
Hanover goes on to assert that even if Article 8.2 of the Amended Base Lease does not create an affirmative duty to mine coal, the Coal Subleases create that duty because the Patriot Subsidiaries and WWMV agreed that WWMV would:
*837 [c]omply with Section 8.2 of the Amended Base Lease; (2) diligently apply for and diligently take all commercially reasonable efforts and action necessary to acquire the Permits and Bonds which are required for WWMV to conduct mining operations upon the Sublease Premises; and (3) after acquiring all permits and Bonds commence and prosecute mining operations upon the Subleased Premises as soon as and for as long as such mining operations can be conducted on the Subleased Premises on a commercially reasonable basis.
Hanover reasons that because LML consented to the Coal Subleases, it effectively ratified or adopted the Coal Subleases so that any obligations owed to Patriot were also owed to LML. But, LML was not a party to the Coal Subleases. And, the Consent to Sublease made clear that "[t]his agreement shall not be construed as a novation but is merely consent to the foregoing WWMV Sublease." That language protects LML from the very assertion Hanover now makes.
Even if LML did come within the purview of duties owed under the Coal Subleases, Hanover's assertion that the patchwork of documents imposes a heightened obligation to mine is inaccurate. Hanover confuses discretionary language with mandatory language. Any obligation that WWMV might have had to mine coal under the Coal Subleases was limited to such "mining operations [as could] be conducted on the Subleased Premises on a commercially reasonable basis." This clause, read in conjunction with Section 8.2 of the Amended Base Lease as the Coal Subleases require, clearly shows that Hanover was not obligated to mine under any circumstances, as underscored by the fact that no coal was ever mined at one of the two subleased mines.
Hanover next asserts that even if the contracts together did not present an express obligation to mine coal, an implied contractual requirement to mine coal existed sufficient to support the imposition of a mechanic's lien on LML's property. Relying on our holding in Taylor v. Buffalo Collieries Co. , Hanover argues that "[t]he court should regard the obvious intent and design of the parties, and the object to be attained by them, as well as the language of the instrument itself."[33] Hanover asserts that WWMV had no other reason to sublease the premises and pay a minimum royalty if it had no intention to mine coal and make money. But as LML notes, "an implied contract and an express one covering the identical subject-matter cannot exist at the same time. If the latter exists, the former is precluded."[34] Because the Amended Base Lease clearly gave the option to mine coal or make minimum royalty payments in lieu of mining, the circuit court was correct in determining that an implied contract contrary to the written contract cannot exist.
In its fourth assignment of error, Hanover asserts that the circuit court erroneously found that: (a) WWMV was not an agent for purposes of the mechanic's lien statute based on a provision of the Coal Subleases in which WWMV and the Patriot Subsidiaries stated that WWMV was not an agent of either the Patriot Subsidiaries or LML; and (b) there was "no special provision creating any agency between WWMV and [LML] because Hanover "expressly disavowed the existence of any such claim." Hanover also argues that although the Coal Subleases provide that "WWMV shall in no way be considered an agent or employee of Sublessor or Lessors," they do not provide that WWMV is not the agent of the Patriot Subsidiaries or LML. Specifically, Hanover takes issue with the circuit court's failure to examine the parties' conduct when relying "exclusively" on the parties' contractual agency disclaimer.
We have held that "proof of an express contract of agency is not essential to the establishment of the relation. It may be inferred from facts and circumstances, including conduct."[35] And, "whether a relationship is characterized as agency in an *838 agreement between parties is not necessarily controlling."[36] Further, we have held that "one of [the] essential elements of agency relationship is [the] existence of some degree of control by [the] principal over [the] conduct and activities of [the] agent."[37]
Even if Hanover's assertion that the terms of the Amended Base Lease show that LML exercised a degree of control over the conduct and activities of WWMV were true, it would be overcome by Hanover's stipulation that LML "did not direct or control any activities or work on the property." And when Hanover entered into the Contract Mining Agreement with WWMV, it acknowledged receipt of the Amended Base Lease and the Coal Subleases and agreed to the terms of both. Specifically, the Coal Subleases provide that "WWMV shall in no way be considered an agent or employee of [Patriot] or [LML]." And the Amended Base Lease provides that "[n]othing contained herein or implied hereby shall in any way be construed as creating or constructing any relationship of partnership, joint venture, agency, or employer and employee, between Lessor and Lessee." We agree with the circuit court that none of the terms that Hanover takes issue with constitute "control" sufficient to establish an agency relationship or to overcome the damning stipulations made.
Next, Hanover asserts that the circuit court failed to consider the statutory basis for an agency relationship between WWMV and LML as found in West Virginia Code §§ 38-2-22 and - 23, which provide a mechanism for an owner to protect itself in the event the contractor fails to pay subcontractors. Specifically, § 38-2-22[38] allows the owner to record a contract and bond. And § 38-2-23 provides that if an owner fails to record the contract and bond, "then such contractor shall be deemed to be the agent of such owner. ..."[39] Here, because LML failed to require the general contractor (WWMV) to be bonded and no contract and bond were recorded, Hanover alleges that this leaves open a statutory basis for a finding that WWMV was LML's agent and that the circuit court erred by finding that the contractual language in the Coal Subleases was determinative. We disagree. We can *839 easily dispose of this issue because West Virginia Code §§ 38-3-22 and -23 are only triggered if the requirements for West Virginia Code §§ 38-2-1 and - 2 are met. Because we agree that Hanover did not have valid mechanic's liens under these sections, we need not proceed with further analysis on the issue.
In its fifth assignment of error, Hanover asserts that the circuit court erroneously construed language in the Contract Mining Agreement and the Amended Base Lease to mean that Hanover had a duty to not place liens on the property and, therefore, erred in ordering Hanover to remove its liens against LML. We disagree. Section 12.1 ("Obligations to Remove") of the Amended Base Lease provides that a "lessee shall not permit any lien to be placed on or encumber the leased premises or the coal in, on, or under the leased premises. Should any encumbrance or lien be placed on such coal, Lessee shall cause the same to be promptly discharged or removed. ..." Relying on the "Receipt of Lease"[40] Section of the Contract Mining Agreement, the circuit court properly applied Section 12.1 to Hanover through the Contract Mining Agreement between WWMV and Hanover, as Hanover agreed to step in as if it were a party to the Amended Base Lease.
Finally, in Hanover's sixth assignment of error, it asserts that the circuit court erred in finding that Hanover's "extra-jurisdictional case law is inapposite and undercuts its arguments." In its motion for partial summary judgment, Hanover cited to a California case[41] and a Washington case[42] to show that mineral interests have been held lienable in what it alleged to be similar circumstances. We need not explore the merits of these cases to agree with the circuit court's conclusion that they are inapposite. Unlike California and Washington, West Virginia has not enacted a mechanic's lien statute specific to mines or mining operations, nor has the Legislature enacted language rendering a lessee operating a mine as the agent of the landowning lessor for purposes of the mechanic's lien statute. These cases are entirely irrelevant to the statutory mechanisms-or lack thereof-in place in West Virginia. Asking the circuit court or this Court to adopt their holdings would require us to legislate from the bench and entirely upend hundreds of years of case law as it relates to coal leases.
IV. CONCLUSION
For the reasons set forth above, we affirm the November 15, 2017 order of the Circuit Court of Boone County, West Virginia granting LML's Motion for Summary Judgment.
Affirmed.
JUSTICE JENKINS is disqualified.
JUDGE ANITA HAROLD ASHLEY, sitting by temporary assignment.

Interest Holder Respondents include: LML Properties, LLC; RBL-AAW Holdings, LLC; Robert B. Lafollette Holdings, LLC; Wright Holdings, LLC; AAW Holdings, LLC; Prichard School, LLC; Broun Properties, LLC; LaFollette Holdings, Ltd.; James A. LaFollette, LLC; City National Bank of West Virginia as Trustee Under a Trust Agreement Dated December 30, 1983, with the Children of A.M. Prichard, Jr., Deceased Namely A.M. Prichard, III, Lewis Prichard and Sarah Ann Prichard, and their Respective Spouses; Riverside Park, Inc., a West Virginia Corporation; PRC Holdings, LLC; and The H.A. Robson Trust.

Neither Cedar Coal nor its successor-in-interest, Patriot Coal Corporation (Patriot Coal), is a party to this appeal.

Section 5.2 of the Amended Base Lease provided: "Minimum Royalty. During the term of this Agreement Lessee [Cedar] shall pay to Lessor [LML] as minimum royalty without regard to the quantity of coal mined, which shall be payable without demand therefor [monthly]."

Section 5.3 of the Amended Base Lease provided: "Tonnage Royalty. Lessee shall pay to Lessor for each ton of 2,000 pounds of coal produced and shipped hereunder from each Tract in the leased premises, tonnage royalty of, which ever is greater, either (a) or (b) of the average gross sales price per said net ton f.o.b...[monthly.]"

Section 8.2 (Mine-or-Pay Clause) of the Amended Base Lease provides:
Obligation to Mine. It is understood that it is anticipated that the leased premises will be developed as a coal mining property and that [Cedar] expects to energetically pursue such development, but that such development is dependent on numerous factors, many of which are not within the control of either party. Accordingly, [Cedar] shall have the sole discretion to determine the timing of operations hereunder and this Agreement shall not be forfeited or cancelled for failure on the part of [Cedar] to commence exploration, development, or mining operations on the leased premises or to diligently prosecute mining operations once such operations have been commenced, it being expressly understood that payment of minimum royalty fully compensates [LML] for such failure.

Section 1 of the Coal Subleases provides (in relevant part):
Sublease - Compliance With Amended Base Lease. Sublessor hereby subleases to WWMV, and WWMV hereby subleases from Sublessor, subject to and in accordance with the terms and conditions of the Amended Base Lease and this Sublease, the right to mine by any mining method permitted under the Amended Base Lease...as shown on the map attached hereto as...Exhibit B to Coal Sublease Between [Patriot Subsidiaries] and WWMV, LLC.

Id.

Section 3 of the Coal Subleases provides (in relevant part):
Royalty; Overriding Royalty. WWMV shall pay directly to Sublessor any royalty, including any wheelage payments, of any kind due under the Amended Base Lease in full compliance with the terms and requirements of the Amended Base Lease. Sublessor shall pay directly to Lessors... any royalty ... including any wheelage payments, of any kind due under the Amended Base Lease in full compliance with the terms of the Amended Base Lease.

Section 4 of the Coal Subleases provides (in relevant part) that "WWMV shall in no way be considered an agent or employee of Sublessor or Lessors."

"Sublessor and WWMV, jointly and severally, shall indemnify, defend and hold harmless [LML]. ..."

Section 23 of the Contracting Mining Agreement states:
Receipt of Lease. [Hanover] acknowledges receipt of a copy of the documents (Documents) under which [WWMV] obtains mining rights to the Premises and which is included in this Agreement as Exhibit B; has read and examined the documents; and hereby agrees that all work to be performed by [Hanover] or under this Agreement shall be in conformance with this Agreement and all the terms, conditions and obligations of the Documents, insomuch as the Documents do not conflict with this Agreement. The rights and privileges of [Hanover] hereunder are and shall be construed as limited to such rights and privileges only as [WWMV] possesses and has the lawful right to contract. [Hanover] agrees to assume, in performing under this Agreement, the obligations and conditions under the documents relating to mine operations in the same manner as if [Hanover] were a party to the Documents, except that [WWMV] shall make all payments as required by the Documents.

Syl. Pt. 1, in part, Painter v. Peavy , 192 W. Va. 189, 451 S.E.2d 755 (1994).

W. Va. R. Civ. P. 56(c), in part.

We decline to consider Hanover's third assignment of error that the circuit court erred by holding that mining coal was not an improvement to the property. As LML notes, the issue was not briefed by the parties below and was not ruled upon by the circuit court. "Our general rule is that nonjurisdictional questions not raised at the circuit court level, but raised for the first time on appeal, will not be considered." Shaffer v. Acme Limestone Co. , 206 W. Va. 333, 349, 524 S.E.2d 688, 704 (1999) (citing Whitlow v. Board of Educ. of Kanawha County, 190 W.Va. 223, 226, 438 S.E.2d 15, 18 (1993) ).

Syl. Pt. 2, 61 W. Va. 191, 56 S.E. 345 (1907).

Id.

See Syl. Pt. 3, Badger Lumber Co., Inc. v. Redd , 213 W. Va. 453, 583 S.E.2d 76 (2003).

W. Va. Code § 38-2-2 (2011) (emphasis added).

W. Va. Code § 38-2-1 (2011) (emphasis added).

Headley v. Hoopengarner , 60 W. Va. 626, 635, 55 S.E. 744, 748 (1906).

See W. Va. Code § 38-2-1.

135 W. Va. 247, 63 S.E.2d 519 (1951).

Id. at 248, 63 S.E.2d at 520.

Id. at Syl. Pt. 1.

Id. at 252-53, 63 S.E.2d at 522.

173 W. Va. 423, 317 S.E.2d 508 (1984).

Id. at 424, 317 S.E.2d at 510.

Id.

Id.

Id. at 426-27, 317 S.E.2d at 512.

Id. at 512 (internal citations omitted) (emphasis added).

Emphasis added.

Syl. Pt. 3, 72 W. Va. 353, 79 S.E. 27 (1913).

Marshall v. Elmo Greer & Sons , 193 W. Va. 427, 430, 456 S.E.2d 554, 557 (1995) (quoting Rosenbaum v. Price Const. Co. , 117 W. Va. 160, 165, 184 S.E. 261, 263 (1936) ).

Harper v. Jackson Hewitt, Inc. , 227 W. Va. 142, 154, 706 S.E.2d 63, 75 (2010) (quoting General Elec. Credit Corp. v. Fields , 148 W. Va. 176, 181, 133 S.E.2d 780, 783 (1963) ).

Id. at 155-56, 706 S.E.2d at 76-77 (internal citation omitted).

Syl. Pt. 3, Teter v. Old Colony Co. , 190 W. Va. 711, 441 S.E.2d 728 (1994).

W. Va. Code § 38-2-22 states:
Any owner may limit his liability upon a contract such as is mentioned in section one of this article to the sum agreed therein to be paid therefor, by recording his contract with such general contractor, in the office of the clerk of the county court of the county wherein such building or other structure is situated, prior to the beginning of the building, erection and construction thereof, and by requiring to be given by his general contractor, and by recording with such general contract, a valid and solvent bond, in a penalty equal to the contract price, with solvent surety, conditioned that in the event any laborer, materialman or other person, having perfected his lien as allowed by this article, be deprived by the recordation of the owner's contract from receiving from such owner the amount of his lien, then such bond and the surety thereon shall be responsible to such lien or for the amount of such lien account, or for any balance thereof not collected by such lien or from such owner and from such property. Any such owner who shall cause his general contract to be recorded in such clerk's office and who shall cause to be executed and recorded the bond therewith as hereinbefore provided shall be exempt from the payment of more than such contract price, and his property shall likewise be exempt therefrom, and all such liens created by this article as are not fully satisfied and discharged by such owner, by reason of such recordation, shall be paid by such contractor and his surety on such bond. If liens in excess of the contract price are perfected as provided in this article, the owner shall be liable to each lien claimant pro rata, in the proportion which the contract price bears to the total amount of the liens so perfected.

W. Va. Code § 38-3-23 states:
In the event any such owner should fail to record such contract and bond, or in the event the penalty of such bond should not be equal to the contract price, or in the event such bond should not be solvent at the time when given, then such contractor shall be deemed to be the agent of such owner and the building or other structure and the improvements appurtenant thereto, together with the interest of the owner thereof in and to the lot of land whereon the same stands or to which it is removed, shall be held liable and subject to such perfected liens, for the full and true value of all work and labor done and of all materials, machinery and equipment furnished therefor, although the same may exceed in the aggregate the price stipulated in the contract between the owner and the contractor.

The "Receipt of Lease" section in the Contract Mining Agreement provides:
Contractor...hereby agrees that all work to be performed by Contractor or under this Agreement shall be in conformance with this Agreement and all the terms, conditions, and obligations of the Documents, insomuch as the Documents do not conflict with this Agreement .... Contractor agrees to assume, in performing under this Agreement, the obligations and conditions under the Documents relating to mine operations in the same manner as if the Contractor were a party to the Documents, except that Owner shall make all payments as required by the Documents.

Higgins v. Carlotta Gold Mining Co. , 148 Cal. 700, 84 P. 758 (Cal. 1906).

Finos v. Netherlands American Mortgage Bank , 147 Wash. 86, 265 P. 167 (1928).